06-0815-ag
Estate of Thompson v. Comm'r of Internal Revenue

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: April 23, 2007    Decided: August 23, 2007)

Docket No(s). 06-0815-ag (Lead); 06-1132-ag (XAP)

- - - - - - - - - - - - - - - - - - - -x

ESTATE OF JOSEPHINE T. THOMPSON,
DECEASED, CARL T. HOLST-KNUDSEN, & THE
BANK OF NEW YORK, EXECUTORS,

        Petitioners-Appellants-
        Cross-Appellees,

    -v.-

COMMISSIONER OF INTERNAL REVENUE,

        Respondent-Appellee-Cross-
        Appellant.

- - - - - - - - - - - - - - - - - - - -x

    Before:      JACOBS, Chief Judge, LEVAL and POOLER,
                    Circuit Judges.

Appeal from the judgment of the United States Tax Court (Swift, J.), valuing an estate's interest in a closely held company and declining to impose an underpayment penalty against petitioners.

We vacate the judgment and remand to correct an error in calculation and for further proceedings concerning the underpayment penalty.

JOSHUA M. RUBINS (Robert H. Goldie and Kirk H. O'Ferrall, on the brief), Satterlee Stephens Burke & Burke LLP, New York, New York, for Appellants.

RICHARD FARBER (Steven W. Parks, on the brief), for Eileen J. O'Connor, Assistant Attorney General, Tax Division, Department of Justice, Washington, D.C., for Appellee.

DENNIS JACOBS, Chief Judge:

For estate tax purposes, the United States Tax Court (Swift, J.) valued one-fifth of a closely held company at $13.5 million--an amount far above the $1.75 million valuation proffered by the estate of Josephine T. Thompson ("Estate") and far below the $32 million valuation proffered by the Commissioner of Internal Revenue ("Commissioner")-- and declined to impose an underpayment penalty against the Estate, principally on the grounds that the Commissioner's estimate was so high in the other direction and that the valuation issues were fairly debatable. The Court found that the Estate employed a method that exaggerated the risks

associated with technological change, while the Commissioner's methodology was generally deficient. The Estate appeals chiefly on the ground that, pursuant to § 7491 of the Internal Revenue Code ("IRC"), the burden of proof on the issue of valuation shifted to the Commissioner when (as the parties have stipulated) the Estate introduced credible evidence on the issue, and that the Tax Court was therefore compelled to adopt the Estate's valuation once it rejected the Commissioner's. The IRS appeals chiefly on the ground that the Estate's underpayment was such that it was error for the Tax Court to refuse to impose an underpayment penalty.

We vacate the judgment because there is a conceded error in the Tax Court's calculation and because the Court's findings are insufficient to support the application of the reasonable cause exception to the otherwise mandatory underpayment penalty. We remand for further proceedings consistent with this opinion.

**I**

When Josephine T. Thompson died on May 2, 1998, her estate included approximately 20% of the common shares of

Thomas Publishing Co., Inc. (the "Company"), a century-old private, closely held corporation which produces business-to-business industrial and manufacturing directories and publications. Descendants of the Company's founder own almost 90% of the shares; no shares have ever been publicly traded; and no stock sales had occurred in the ten years prior to Thompson's death.

The Company's business was solely paper-based until the 1990s, when it began to adapt to the digital marketplace. The Company offered its directories on CD-ROM in 1993, and made its directories available free on the Internet in 1995. By 1998, the Company's website was recognized as the sixth-ranked business-to-business website in the United States. From 1995 to 1998, print subscriptions fell while CD-ROM and Internet subscriptions increased dramatically. See Estate of Thompson v. Comm'r, T.C.M. (RIA) 2004-174, 2004 WL 1658404, at *2-*4 (July 26, 2004).

In the six years preceding Thompson's death (1993-1998), the Company's net sales revenue grew 53% but expenses kept pace; thus during that period operating income stayed constant around $25 million. In the years following Thompson's death, net sales revenue averaged $273 million

4

for three years (1999-2001), then dropped to $235 million (2002), while operating expenses grew 9% over three years (falling in the fourth year), so that operating income dropped, turned to losses, and the Company ended 2002 barely breaking even.

**II**

For estate tax purposes, the Estate calculated the value of Thompson's share of the Company at $1.75 million using the capitalization of income method, under which a company's value is calculated by [i] projecting the company's annual income, [ii] determining a company-specific capitalization rate, [iii] dividing the projected income by the capitalization rate, and [iv] adding the value of non-operating assets.

The Estate projected the Company's annual income to be $7.9 million (the average from 1993-1997 minus $10 million in projected technology expenditures), then used a capitalization rate of 30.5% based on: [1] a 6% risk-free base rate of return; [2] a 7.8% equity risk premium; [3] a 4.7% small-stock risk; and [4] a 12% Internet and management risk. No non-operating assets were added. This yielded a

valuation of $25.8 million for the Company, of which the Estate's share was $5.3 million, which was then further reduced (by 40%) to account for the Estate's minority ownership interest and (by a further 45%) to account for lack of marketability, to arrive at the final valuation of $1.75 million. The Estate argues that this valuation reflects grim prospects in 1998 and the Internet's "substantial threat to TPC's viability as a business."

The Commissioner valued the Estate's interest at $32 million, using two independent methods: the comparable public company method, which yielded a Company value of $260 million; and the discounted cashflow method, which was performed twice (using different estimated future values) and which yielded Company values of $212.6 million and $158.8 million.[1] The Commissioner settled on $225 million, of which the Estate's share was $46.3 million. That value was then discounted by 30% to account for lack of marketability, thus arriving at the final value of $32 million. The Commissioner contends that his valuation more

---

[1] Because the Tax Court ultimately rejected the Commissioner's valuation, and the Commissioner does not appeal that rejection, we only briefly summarize the Commissioner's methodology.

accurately reflects the state of affairs in 1998, when there was no reason to think that the Internet would have the deleterious effect on TPC's business that occurred from 2000 to 2002.

**II**

The Tax Court rejected both of the parties' valuations as "deficient and unpersuasive," Estate of Thompson, 2004 WL 1658404, at *17, on the following grounds: The Commissioner's valuation was rejected because the comparable companies chosen were insufficiently similar to the Company, id. at *20, and the discounted cashflow analysis contained "significant errors" and "suspect" recalculations, id. at *21; the Estate's valuation was rejected because it improperly included a 12% Internet and management risk factor in the capitalization rate, erroneously omitted certain non-operating assets, and inflated the discounts for minority interest and lack of marketability, id. at *19-*20.

The Tax Court further criticized the Estate for its decision to "hire[] a lawyer and an accountant from Alaska, both with relatively little valuation experience, to value the estate's 20-percent interest in TPC" given that "the

estate, the executors of the estate, and the underlying company, the stock of which is being valued, were all headquartered and based in the New York City metropolitan area." Id. at *17.

The Court then undertook its own valuation, employing the capitalization of income method. The Court adopted the Estate's projected annual income of $7.8 million, but used a capitalization rate of 18.5% (having eliminated the 12% Internet and management risk factor which had bumped the Estate's number to 30.5%). Dividing $7.8 million by 18.5% yielded a subtotal of $42.5 million. To that, the Court added $68 million in short-term investments, which the Court considered non-operating assets (but which the Estate had considered operating assets, and therefore omitted from its valuation). Thus the Court arrived at a total value of $111 million for the Company. The Estate's $22.7 million share (20%) was then reduced by 15% to account for the Estate's minority interest and 30% for lack of marketability (compared to the Estate's 45% and 40%, respectively), which yielded the Court's valuation of the Estate's share of the Company: $13.5 million. Id. at *22.

**III**

The valuation of a company is a factual issue. <u>See</u> <u>Silverman v. Comm'r</u>, 538 F.2d 927, 931 (2d Cir. 1976). Under IRC § 7491, "[i]f . . . a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer . . . , the Secretary shall have the burden of proof with respect to such issue." 26 U.S.C. § 7491(a)(1). The parties stipulated that the Estate submitted "credible evidence" in support of its valuation. <u>See</u> <u>Estate of Thompson</u>, 2004 WL 1658404, at *24 n.6. Accordingly, the burden of proof shifted to the Commissioner on the issue of valuation. The Estate argues that the Commissioner necessarily failed to satisfy his burden. It contends that, under § 7491, the Tax Court's rejection of the valuation proffered by the Commissioner required the Court to adopt the Estate's competing valuation. We disagree.

Before the enactment of § 7491, "a deficiency determined by the Commissioner [was] presumptively correct and the taxpayer [bore] the burden of disproving it." <u>Silverman</u>, 538 F.2d at 930. Section 7491 reallocated the burden. However, this reallocation does not require the Tax

Court to adopt the taxpayer's valuation, however erroneous, whenever the Court rejects the Commissioner's proposed value; the burden of disproving the taxpayer's valuation can be satisfied by evidence in the record that impeaches, undermines, or indicates error in the taxpayer's valuation.

Here, the Commissioner not only presented evidence in support of his own valuation; he also cited record evidence to rebut the Estate's valuation, arguing that the Estate's profit projections were overly pessimistic, that it failed to properly account for non-operating assets, and that its assumptions about the Internet were inconsistent with the Company's investments in Internet-related projects. Notwithstanding the enactment of § 7491, it remains the case that (as we said in 1976) the "Tax Court is not bound by the formulas or opinions proffered by expert witnesses. It may reach a determination of value based upon its own analysis of all the evidence in the record."[2]  Id. at 933.

---

[2] Because the Tax Court adopted some of the Commissioner's arguments in opposition to the Estate's valuation, we have no occasion to decide whether § 7491 would require a court to adopt a taxpayer's valuation if the court rejected all arguments advanced by the Commissioner in opposition to that valuation, or if the Commissioner made no such arguments.

**IV**

In the alternative, the Estate argues that, in arriving at its independent valuation, the Tax Court erred by [i] counting $68 million in short-term investments as non-operating assets, which were therefore added to the figure for the Company's capitalized income; and [ii] omitting a technology-related risk factor in its capitalization rate. "The Tax Court's valuation is a factual finding conclusive upon review if not clearly erroneous." Id. at 931. "[O]ur powers of review are very . . . limited upon all issues of fact, and that limitation is particularly narrow when the issue is one of value." Sisto Fin. Corp. v. Comm'r, 149 F.2d 268, 269 (2d Cir. 1945); see also Silverman, 538 F.2d at 931. There is evidence to support both of the challenged features of the Tax Court's valuation.

We therefore affirm the Tax Court's valuation--in all respects but one: the parties agree that the Tax Court made an error in calculation. As set out in the prior paragraph, the Court treated $68 million in short-term investments as non-operating assets, and therefore added $68 million to the Company's capitalized income. But when the Court calculated the Company's projected income, it included the income

11

produced by the $68 million in its projection, thus factoring in the $68 million twice. The Commissioner estimates that this error resulted in a $1.2 million overstatement in the value of the Estate's shares; the Estate (which agrees that the error was made) does not attempt to quantify its effect. We therefore remand for the Tax Court to correct this double-counting error. We affirm the Tax Court's valuation in all other respects.

## V

The Tax Court determined that the Estate's share of the Company was worth $13.5 million; the Estate valued its share at $1.75 million--less than 15% of the value determined as correct by the Court.[3] Under the version of IRC § 6662 then in effect, if the claimed value of the Estate is not more than 25% of the amount determined to be correct, the taxpayer must pay an accuracy-related penalty equal to 40% of its underpayment. See 26 U.S.C. § 6662(a), g(1), (h)(1),

---

[3] We recognize that the Tax Court's final valuation of the Estate may be somewhat different when the double-counting error is fixed. Nonetheless, it appears that the reduction in valuation will not be sufficient to bring the Estate's valuation above 25% of the court's ultimate determination.

12

(h)(2)(C) (2006), amended by Pension Protection Act of 2006 § 1219, Pub. L. No. 109-280, 120 Stat. 780, 1083 (2006). With one exception, this penalty is mandatory. See id. § 6662(a) ("there shall be added to the tax an amount equal to [40] percent of the . . . underpayment" (emphasis added)). An exception is allowed if "it is shown that there was a reasonable cause for such [underpayment] and that the taxpayer acted in good faith with respect to such [underpayment]." Id. § 6664(c)(1).

The Tax Court invoked this reasonable-cause exception and declined to impose an accuracy-related penalty. Its decision was based on the following considerations: [i] the valuation "was particularly difficult and unique"; [ii] the valuation "involved a number of difficult judgment calls"; [iii] the valuation was "difficult and imprecise" because of "the difficult question as to how the Internet and the risks and opportunities associated therewith should be regarded as affecting TPC"; and [iv] while "the experts for the estate were aggressive in their relatively low valuation of TPC," the Court's own valuation was "closer to the estate's valuation than to [the Commissioner's] valuation." Estate of Thompson, 2004 WL 1658404, at *23.

13

"We review the tax court's factual determinations of whether a taxpayer qualifies for the reasonable cause exception for clear error." Sather v. Comm'r, 251 F.3d 1168, 1177 (8th Cir. 2001); accord Van Scoten v. Comm'r, 439 F.3d 1243, 1260 (10th Cir. 2006). However, while it is a question of fact whether "the elements that constitute 'reasonable cause' are present in a given situation," it is a question of law "what elements must be present to constitute 'reasonable cause.'" United States v. Boyle, 469 U.S. 241, 249 n.8 (1985). Accordingly, we review the factual determinations for clear error, but we review de novo whether those determinations were sufficient to satisfy the elements of reasonable cause.

Under agency regulations, the existence of reasonable cause is determined "on a case-by-case basis, taking into account all pertinent facts and circumstances. . . . Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." 26 C.F.R. § 1.6664-4(b)(1). "Reliance on . . . an appraiser does not necessarily demonstrate reasonable cause and good faith," but such reliance does satisfy the reasonable cause exception if, "under all the circumstances,

14

such reliance was reasonable and the taxpayer acted in good faith." Id. Thus reliance on an expert's opinion "may not be reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law." Id. §1.6664-4(c)(1).

The Tax Court's findings are insufficient to support a determination of reasonable cause under § 6664. The factors set out in the regulations search the good faith of the taxpayer--either in assessing its own liability or in relying on an expert to do so. But the Tax Court made no finding as to whether the Estate's reliance on its experts was reasonable and in good faith, or whether the Estate knew or should have known that they lacked the expertise necessary to value the Company.

To prepare its valuation of a New York publishing company, the Estate turned to George E. Goerig of Anchorage, Alaska. The Tax Court found that an Alaska lawyer was retained so that the Commissioner's audit of the Estate would not be conducted by the Commissioner's New York staff, but by the Commissioner's office in Alaska, "where Goerig believed and apparently represented to the estate's

15

representative that he would be able to obtain for the estate a more favorable valuation of the estate's [Company] stock." Estate of Thompson, 2004 WL 1658404, at *8. "[T]he estate had learned about Goerig from an attorney for decedent's family who had met Goerig on a fishing trip." Id.

Goerig was assisted by Paul Wichorek, an accountant in the same remote location. Id. The Court found that these experts "demonstrated no experience with . . . Internet- and technology-related companies," id. at *11, and were "too inexperienced, accommodating, and biased in favor of the estate," id. The Court summarized their qualifications as follows:

> Goerig is a lawyer with an audit and tax dispute resolution practice, and a tax return preparer, and he undertakes occasional valuations for small businesses and private individuals. From his resume, he appears to have attended limited appraisal courses, other than a few courses while working for [the Commissioner] many years ago. Goerig also was appointed to act as administrator for the estate to handle the anticipated audit by respondent of the estate's Federal estate tax return, a role which we regard as somewhat in tension with his role as a purported independent valuation expert for the estate.
>
> Wichorek provides accounting and tax preparation services, does business consulting, and undertakes occasional valuations for small businesses, generally in the context of divorce and property

16

> settlement disputes. He belongs to no professional organizations or associations relating to his appraisal or valuation work.
>
> Although we admitted into evidence the estate's valuation reports and treated them as credible, we regard those reports and the testimony of the estate's experts to be only marginally credible. Goerig and Wichorek were barely qualified to value a highly successful and well-established New York City-based company with annual income in the millions of dollars.

Id. at *17-*18.

A determination as to the Estate's good faith is required. Accordingly, we vacate the Tax Court's decision not to impose an accuracy-related penalty, and we remand so that the Court can determine whether the Estate's reliance on Goerig and Wichorek was reasonable and in good faith.

*　　*　　*

For the foregoing reasons, the judgment of the Tax Court is vacated and remanded for further proceedings consistent with this opinion.

17