In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1109

AMERICAN BOAT COMPANY, LLC, and
AMERICAN MILLING, LP, its tax matters partner,

*Plaintiffs-Appellees,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 06 CV 788—**G. Patrick Murphy**, *Judge.*

ARGUED MAY 28, 2009—DECIDED OCTOBER 1, 2009

Before BAUER, FLAUM, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. This is a tax case involving another example of the now infamous Son of BOSS tax shelter. The Internal Revenue Service (IRS) determined that American Boat, LLC implemented an illegal tax shelter and misstated certain information on its tax documents, resulting in significant tax underpayment by

its owners. On July 18, 2006, the IRS issued American Boat a Notice of Final Partnership Administrative Adjustment (FPAA). American Boat, through its tax matters partner American Milling, LP, sued the United States seeking judicial review of the FPAA. The district court agreed with the IRS that American Boat's transactions were invalid and that the related tax benefits were improper—conclusions American Boat does not appeal. The government, however, appeals the district court's determination that American Boat and its members are not subject to accuracy-related penalties. Although we see merit in some of the government's arguments, we find no reversible error below.

## I. BACKGROUND

This case arose from a series of transactions constituting an example of what is now known as a "Son of BOSS" tax shelter. The shelter, which was aggressively marketed by law and accounting firms in the late 1990s and early 2000s, is a younger version of its parent—the equally illegal BOSS (bond and options sales strategy) shelter. *See Kligfeld Holdings v. Comm'r*, 128 T.C. 192, 194 (2007) (providing a description of the Son of BOSS tax shelter). A Son of BOSS shelter may take many forms, but common to them all is the transfer to a partnership of assets laden with significant liabilities. *Id.* The liabilities are typically obligations to purchase securities, meaning they are not fixed at the time of the transaction. The transfer therefore permits a partner to

inflate his basis[1] in the partnership by the value of the contributed asset, while ignoring the corresponding liability. *Id.*; *see also Clearmeadow*, 87 Fed. Cl. at 514. The goal of the shelter is to eventually create a large, but not out-of-pocket, loss on a partner's individual tax return. This may occur when the partnership dissolves or sells an over-inflated asset. In turn, this artificial loss may offset actual—and otherwise taxable—gains, thereby sheltering them from Uncle Sam.

In this case, American Boat does not challenge the district court's determination that the particular transactions and tax structure violated tax law. Fortunately for those of us less mathematically inclined, we need not dwell on the finer details of American Boat's transactions. The IRS will receive its delinquent taxes. The real question in this case is whether American Boat, managed by David Jump, had reasonable cause for its underpayment. If it did, then no accuracy-related penalty applies; if it did not, American Boat's owners will be liable for

---

[1] A "basis" refers to "[t]he value assigned to a taxpayer's investment in property and used primarily for computing gain or loss from a transfer of the property." *Black's Law Dictionary* 161 (8th ed. 2004). Each partner's basis in his or her partnership interest is known as the "outside basis." *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 456 n.12 (5th Cir. 2008). The partnership, as an entity, also calculates its partnership items (income, credit, gain, loss, deduction, etc.) to determine its basis in its assets, called its "inside basis." *Clearmeadow Invs., LLC v. United States*, 87 Fed. Cl. 509, 519 (2009); *see also Kornman*, 527 F.3d at 456 n.12.

forty percent of the underpayment of $1,260,544. *See* 26 U.S.C. § 6662(h).

Jump is a St. Louis businessman who has developed a large grain and commodities business in central Illinois. He has owned a variety of business interests, including a fleet of towboats operating on the Mississippi River. In 1996, as Jump's wealth continued to grow, his Chicago banker advised him to consider planning his estate. At his banker's recommendation, Jump contacted Erwin Mayer, an attorney at the Chicago law firm of Altheimer & Gray.

Mayer developed an estate plan that reorganized Jump's operating entities into a number of limited partnerships. Mayer also established the Jump Family Trust, which eventually owned more than ninety-eight percent of Jump's many business assets. As part of the reorganization, Mayer recommended that Jump engage in a short-sale version of the Son of BOSS tax shelter. The shelter permitted one of Jump's entities to report a large loss, thereby allowing Jump to offset gains earned from the dissolution of another of his entities. Altheimer & Gray provided a written opinion regarding the validity of the transaction, upon which Jump's accountants relied in preparing subsequent income tax returns. Although Jump's 1996 transactions were likely an invalid Son of BOSS tax shelter, the IRS did not discover them until after the statute of limitations had expired.

Jump's next encounter with the Son of BOSS shelter came in 1998, purportedly as an indirect result of a near-disaster of titanic proportions. One of Jump's towboats,

with multiple loaded barges in tow, struck a bridge near downtown St. Louis. Some of the barges broke free from the towboat, floated down river, and crashed into the Admiral, a floating casino in the St. Louis harbor.

The 2,000 passengers aboard were in grave danger as the Admiral's moorings began to break. With no means of navigation, the steamboat-turned-casino would be left to the currents of a flood-stage Mississippi River. The ship was too tall to fit under the next bridge, meaning that the inevitable collision would either capsize the boat or tear it to pieces. Either outcome could have resulted in one of the worst maritime disasters in United States history. But, fortunately, one of the Admiral's moorings held; the towboat released its remaining barges and pinned the casino against the riverbank until assistance arrived.

The wayward towboat was owned by American Milling, LP, which at that time was the overarching entity that owned most of Jump's businesses. American Milling's potential liability from an accident such as the one that nearly occurred would have easily exceeded the company's insurance coverage. As a result, Jump was advised that he should readjust the ownership structure of his companies to limit potential liability.

In addition to his admiralty attorneys, Jump contacted Mayer again, who was still at Altheimer & Gray. Mayer, familiar with Jump's various businesses, advised Jump that he isolate the towboats from his companies' remaining assets. As a result, American Boat Company,

LLC was born. It eventually came to own and operate Jump's Mississippi River towboats.

Mayer's reorganization advice, however, was not what attracted the IRS's attention. In addition to restructuring, Mayer advised Jump to conduct another short-sale version of the Son of BOSS tax shelter. To do so, Mayer created two other companies for Jump in late 1998: Gateway Grain, LLC, and Omaha Pump, LLC. Sometime thereafter, Jump transferred his eighteen towboats, which were owned by various entities, to American Boat.[2]

On December 15, 1998, Gateway Grain and Omaha Pump engaged in short sales of short-term United States Treasury Notes,[3] resulting in proceeds totaling approximately $30 million. Both companies also entered into

---

[2] The government disputes that Jump, through his various entities, actually transferred title of all eighteen towboats to American Boat.

[3] A short sale involves two distinct transactions. First, the investor typically borrows securities from a broker—depositing margin cash in an account to cover any eventual losses—and sells them for proceeds. Second, the investor must return the borrowed securities to the broker, meaning that he must at some point repurchase the same amount. The investor is therefore counting on a drop in the price of the securities, meaning that he will not have to exhaust his proceeds from the short sale to replace them. The difference in the cost of the securities is his profit; should the price of the securities rise, the additional expense of replenishing the borrowed securities is his loss. *See generally Kornman*, 527 F.3d at 450; *Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 820 (3d Cir. 1988).

repurchase agreements with Morgan Stanley, their broker, using the proceeds as collateral until the Notes were replaced.

The next day, Gateway Grain and Omaha Pump transferred their brokerage accounts—now fat with more than $30 million—to American Boat. Along with the short-sale proceeds, however, came the obligation to close the short-sale transactions. On December 18, American Boat used the $30 million proceeds to close the short sales, resulting in an overall economic loss of just $15,213.86.

The next steps were a series of complex transactions that are largely irrelevant to the issues in this case.[4] Suffice it to say that Jump was able to increase the basis of the eighteen towboats owned by American Boat to match the partners' newly inflated outside basis. The basis in the towboats increased from what American Milling had originally claimed was $3,280,783 to a combined total of $31,594,334.

American Boat accomplished this feat by claiming that the contribution of the short-sale *proceeds* increased the partners' basis by $30 million, but that American Boat's assumption of the corresponding $30 million *obligation* to close the short sales was not a "liability" that

---

[4] For a more detailed explanation of precisely this type of Son of BOSS transaction, see *Kornman*, 527 F.3d 443. In that case, the Fifth Circuit held that a partnership's obligation to close a short sale of United States Treasury notes was a partnership liability, thereby invalidating the Son of BOSS tax shelter. *Id.* at 462.

reduced the partners' basis under § 752 of the Internal Revenue Code. *See* 26 U.S.C. § 752. The result was a drastic artificial increase in the basis that permitted Jump and his entities to claim much higher deductions for the depreciation of the towboats and to offset taxable gains earned by later sales of some of the boats. Based on the structure of the various entities, the consequences of these tax benefits flowed through to Jump's individual tax return.

In addition to the reorganization, Mayer, who had since moved his practice to the law firm of Jenkens & Gilchrist, provided Jump with an opinion letter regarding the validity of the above-described transactions. Among other things, Mayer opined that the increased partnership basis was permissible because the obligation to close the short sales was not a "liability" under § 752. The opinion further stated that the taxpayer had a business purpose for the transferring the short-sale positions to American Boat and that it likewise had a reasonable expectation of making a profit—premises that the government claims were shams.

Beginning in the taxable year 1999, American Milling and Jump claimed substantial tax benefits on their respective returns as a result of the Son of BOSS shelter. In doing so, Jump provided Mayer's opinion letter to his accountants at Deloitte and Touche. Although Deloitte was not asked to opine on the validity of American Boat's short-sale transactions in 1996 or 1998, the accountants informed Jump that they considered the legal position taken by Jenkens & Gilchrist to be accurate. Deloitte

further told Jump that it had implemented the same strategy for some of its other clients, and it could have easily done so for him.

Jump and his companies later changed their accounting firm from Deloitte to a regional firm, Scheffel & Companies, which also prepared and signed their tax returns. Like Deloitte, Scheffel was not asked to advise as to the propriety of the short-sale transactions, but it raised no objection or concern about the increased tax basis in Jump's towboats.

According to American Boat, Jump did not know or have reason to know in 1998 that Mayer, Altheimer & Gray, or Jenkens & Gilchrist had structured similar transactions for other taxpayers. From Jump's perspective at that time, he was merely returning to the same reputable attorney who restructured his businesses two years prior. The government points out, however, that Jenkens & Gilchrist offered similar tax shelters to thousands of wealthy individuals, and the opinion letters were often formulated using a template that ignored the economic realities of the transactions.

As the number of taxpayers using variations of the Son of BOSS tax shelter rose over the next several years, so too did the scrutiny from the IRS, and Jenkens & Gilchrist was at the heart of it. Opinion letters from Mayer and two other lawyers at Jenkens & Gilchrist—Paul Daugerdas and Donna Guerin—not only "led to the firm's demise," *Cemco Investors, LLC v. United States*, 515 F.3d 749, 750 (7th Cir. 2008); *see also* Nathan Koppel, *How a Bid to Boost Profits Led to a Law Firm's Demise*, Wall

St. J., May 17, 2007, at A1, but their roles in the transactions also resulted in a federal criminal indictment for each of them. *See* Chad Bray, *In BDO Case, 7 Charged With Fraud*, Wall St. J., June 10, 2009, at C2.

The IRS discovered American Boat's 1998 Son of BOSS transaction during its investigation of Jenkens & Gilchrist, and it issued an FPAA on July 18, 2006. The IRS determined that American Boat's tax shelter was invalid, and it adjusted the company's basis of its towboats by approximately $30 million. The IRS also imposed a forty percent accuracy-related penalty due to underpayment resulting from a gross valuation misstatement. *See* 26 U.S.C. § 6662(h).

American Milling, the tax matters partner for American Boat, deposited the challenged tax with the IRS and sought judicial review of the FPAA in the Southern District of Illinois. *See* 26 U.S.C. § 6226(a)(2), (e)(1). The district court held that American Boat's Son of BOSS transactions were invalid and lacked economic substance, particularly after we indicated that a similar transaction was invalid, *see Cemco Investors*, 515 F.3d at 751, and the Fifth Circuit determined that the same version of the tax shelter was illegal, *see Kornman*, 527 F.3d at 456. American Boat does not appeal the court's decision that its shelter was invalid.

On the issue of penalties, however, the district court found that American Boat, through its managing partner David Jump, had reasonable cause for inflating the basis in the tugboats, and the accuracy-related penalty in 26 U.S.C. § 6662 therefore did not apply. *See* 26 U.S.C.

§ 6664(c); Treas. Reg. 1.6664-4(a). The court found that Jump turned to Mayer, who was already familiar with Jump's businesses, for legitimate advice following the 1998 maritime accident. At that time, there was no reason for Jump to know that Mayer's advice was risky or incorrect, and the tax shelter, although invalid, was but one component of an overall business readjustment. Furthermore, two accounting firms, Deloitte and Scheffel, did not raise any objection to the tax ramifications of the short-sale transactions.

The government now appeals the district court's ruling that American Boat demonstrated reasonable cause for its underpayment. We find no error in the district court's ruling.

## II. ANALYSIS

Before turning to the primary dispute in this case—whether American Boat established reasonable cause—we must first address our jurisdiction to consider the issue.

### A. Jurisdiction

The parties both agree that the district court had jurisdiction to determine whether American Boat had reasonable cause for its tax underpayment. But a recent decision of the Court of Federal Claims has called our jurisdiction into question. *See Clearmeadow*, 87 Fed. Cl. 509.

First, a bit of background is in order.[5] Partnerships do not pay federal income taxes; the entity, however, must file an annual information return stating the partners' distributive share of the partnership's income, deductions, and other tax items. *See Grapevine Imps., Ltd. v. United States*, 71 Fed. Cl. 324, 326 (2006); *see also* 26 U.S.C. §§ 701, 6031. The individual partners then report their distributive share of taxable items on their personal income tax returns. *See* 26 U.S.C. §§ 701-704.

To avoid the inefficiency associated with requiring the IRS to audit and adjust each partner's tax return, Congress created a unified partnership-level procedure for auditing and litigating "partnership items." *See* Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982 § 402, 26 U.S.C. §§ 6221-6234; *see also New Millennium Trading, LLC v. Comm'r*, 131 T.C. No. 18, 2008 WL 5330940, at *3-4 (U.S. Tax Ct. Dec. 22, 2008); *Grapevine Imps.*, 71 Fed. Cl. at 327. The treatment of all partnership items should be determined at the partnership level, 26 U.S.C. §§ 6211(c), 6221, 6230(a)(1), and any nonpartnership item is resolved during a partner-level proceeding, *id.* §§ 6212(a), 6230(a); *see also Grapevine Imps.*, 71 Fed Cl. at 327.

Prior to 1997, all penalties—even those relating to a partnership item—were assessed at the partner level. *New Millennium Trading*, 2008 WL 5330940, at *7. In 1997, as part of the Taxpayer Relief Act, Pub. L. No. 105-34,

---

[5] For a more thorough explanation of the procedures that follow, see *Tigers Eye Trading, LLC v. Comm'r*, T.C. Memo. 2009-121, 2009 WL 1475159, at *9-10 (U.S. Tax Ct. May 27, 2009).

§ 1238(a), 111 Stat. 788, 1026, Congress amended TEFRA to provide that penalties related to adjustments of partnership items should also be determined during the partnership-level proceeding. *See* 26 U.S.C. §§ 6221, 6226(f); *see also New Millennium Trading*, 2008 WL 5330940, at \*7. Section 6221 now provides that "the tax treatment of any partnership item (*and the applicability of any penalty*, addition to tax, or additional amount *which relates to an adjustment* to a partnership item) shall be determined at the partnership level" (emphases added). Similarly, § 6226(f) states that a court has jurisdiction "to determine . . . the proper allocation of [partnership] items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item."

On the other hand, if an individual partner wishes to raise a partner-level defense to the imposition of a penalty, he must do so in a refund proceeding under § 6230(c). A court does not have jurisdiction to consider a partner-level defense in a partnership-level proceeding. *See New Millennium Trading*, 2008 WL 5330940, at \*8; *Jade Trading, LLC v. United States*, 80 Fed. Cl. 11, 60 (2007).

The question, then, is whether the reasonable cause defense in § 6664(c) is a partnership- or partner-level defense (or both). Although TEFRA defines a "partnership item" in various ways, the definition broadly includes items "required to be taken into account for the partnership's taxable year," as well as those "more appropriately determined at the partnership level than at the partner level." 26 U.S.C. § 6231(a)(3); *see also Tigers Eye Trading*,

2009 WL 1475159, at *19 (noting that partnership-level defenses "include all defenses that require factual findings that are generally relevant to all partners or a class of partners and not unique to any particular partner"). The relevant Treasury Regulation defines the term to include "the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc." Treas. Reg. § 301.6231(a)(3)-1(b); *see also* Treas. Reg. § 301.6221-1(c).

In contrast, a defense at the partner-level is "limited to those that are personal to the partner or are dependent upon the partner's separate return and cannot be determined at the partnership level." Treas. Reg. § 301.6221-1(d); *see also Tigers Eye Trading*, 2009 WL 1475159, at *18-19. The Treasury Regulation notes that one example of a partner-level determination is whether the individual partner has reasonable cause as provided by § 6664(c)(1). Treas. Reg. § 301.6221-1(d).

Despite the inclusion of reasonable cause in Treasury Regulation § 301.6221-1(d), the vast majority of courts have held or indicated that a partnership may also raise such a defense on its own behalf, based on the conduct of its general or managing partner. *See Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 548 (5th Cir. 2009); *Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 703-04 (2008); *see also Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 205-12 (D. Conn. 2004) (considering, without discussing the jurisdictional question, whether

the partnership had reasonable cause to claim large losses); *Santa Monica Pictures, LLC v. Comm'r*, T.C. Memo. 2005-104, 2005 WL 1111792, at *101-12 (U.S. Tax Ct. May 11, 2005) (addressing, without reference to jurisdiction, the reasonable cause defense at the partnership level).

A number of other courts have not directly addressed the issue but have held that a partner may not raise a *partner-level* reasonable cause defense in a partnership-level proceeding, leaving open the possibility that a partnership might raise the defense on its own behalf. *See AWG Leasing Trust v. United States*, 592 F. Supp. 2d 953, 996 (N.D. Ohio 2008) (referring separately to a "partnership-level reasonable cause defense" and a similar partner-level defense, and finding that the court lacked jurisdiction because the plaintiff trust "did not present any evidence in support of a reasonable cause defense *on behalf of the Trust*" (emphasis added)); *Tigers Eye Trading*, 2009 WL 1475159, at *18 ("A defense based on the reasonable cause exception under section 6664(c)(1) . . . may be raised in a partnership-level proceeding if it is not a partner-level defense."); *New Millennium Trading*, 2008 WL 5330940, at *7 (noting that courts have considered the reasonable cause defense when presented through a general or managing partner, but not at the partner-level); *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 131 T.C. No. 10, 2008 WL 4757336, at *37 (U.S. Tax Ct. Oct. 30, 2008) (stating that § 6664(c)(1)'s reasonable cause defense is a partnership-level determination, but refusing to apply it because plaintiff did not meet prerequisites in § 6664(c)(2)); *Jade Trading*, 80 Fed. Cl. at 60 (noting that non-managing plaintiffs asserted a

partner-level defense, as compared to a similar defense by the partnership or managing partner).

As these cases indicate, there has been little dispute previously that a partnership—as well as an individual partner—could raise its own reasonable cause defense. But the Court of Federal Claims recently held that the reasonable cause exception in § 6664(c) is only a partner-level determination that a court may not consider during a partnership-level proceeding. *See Clearwater*, 87 Fed. Cl. at 520-21.

To the extent that the court's holding in *Clearwater* wholly forecloses a partnership from raising an entity-level reasonable cause defense, we disagree. The court's primary premise is correct: a partner may not raise a partner-level defense during a partnership-level proceeding. But we see nothing that would prevent a partnership from raising its own reasonable cause defense, permitting a court to consider the conduct of its managing partner on behalf of the partnership. As the above cases have held, a partnership might raise such a defense based on facts and circumstances common to all partners and which relies on neither an individual partner's tax return nor his unique conduct.

The *Clearwater* court relied on Treasury Regulation § 301.6221-1(d), which defines a partner-level defense, finding that cases such as *Klamath* and *Stobie Creek* are "directly contrary." 87 Fed. Cl. at 520. Although the Regulation cites § 6664(c)(1) as an example of a partner-level defense, it does not foreclose a similar defense

on behalf of the partnership; it only states that "whether *the partner* has met the criteria of . . . section 6664(c)(1)" is a partner-level defense. Treas. Reg. § 301.6221-1(d). The Fifth Circuit concluded that this language did not rule out a partnership-level reasonable cause defense, *see Klamath*, 568 F.3d at 548, and we agree.

In this case, the IRS adjusted American Boat's partnership items arising out of its U.S. Return of Partnership Income (Form 1065), filed in the name of American Boat Company, LLC. The adjustment focused on American Boat's inside basis. To the extent that Jump raises a partner-level defense or seeks a personal refund, we do not have jurisdiction. But American Boat claims that the partnership, through its general partner, had reasonable cause for its tax position. Accordingly, we find that the district court had jurisdiction to consider this issue.

### B. *Merits of the Government's Appeal*

With our jurisdiction intact, we now turn to the substance of the government's argument that American Boat did not demonstrate reasonable cause for its tax position. Specifically, the government asserts that the company could not have reasonably relied on Mayer's advice due to his inherent conflict of interest and that, in any event, Mayer's opinion letter did not meet the threshold requirements of Treasury Regulation § 1.6664-4(c)(1).

*1. Background—Penalties Under 26 U.S.C. § 6662*

Section 6662 of the Internal Revenue Code imposes a mandatory accuracy-related penalty for certain tax underpayments that meet the statutory requirements. 26 U.S.C. § 6662(a), (h); *see also Thompson v. Comm'r*, 499 F.3d 129, 134 (2d Cir. 2007). If the underpayment is due to a "gross valuation misstatement," that is, a misstatement of the correct adjusted basis by 400 percent or more, the taxpayer must pay a penalty of forty percent of the delinquent tax. 26 U.S.C. § 6662(a), (h).

But not every tax underpayment is subject to § 6662's penalties. A taxpayer who had "a reasonable cause" for the underpayment, and acted in good faith with respect to that portion, has a valid defense.[6] 26 U.S.C. § 6664(c)(1); *see also* Treas. Reg. § 1.6664-4(a). Whether a taxpayer had reasonable cause depends on all of the pertinent facts and circumstances of a particular case, with the most important factor being the taxpayer's effort to assess his proper tax liability. Treas. Reg. § 1.6664-4(b)(1).

A common means of demonstrating reasonable cause is to show reliance on the advice of a competent and independent professional advisor. *See id.*; *United States v. Boyle*, 469 U.S. 241, 251 (1985) ("When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the tax-

---

[6] The district court determined that American Boat and Jump had acted in good faith. The government does not contest this ruling on appeal, and we therefore discuss only whether American Boat had reasonable cause.

payer to rely on that advice."); *Stobie Creek Invs.*, 82 Fed. Cl. at 717 ("[T]he concept of reliance on the advice of professionals is a hallmark of the exception for reasonable cause and good faith.").

Relying on a professional, however, will not always get a taxpayer off the hook. To constitute reasonable cause, the reliance must have been reasonable in light of the circumstances. Treas. Reg. § 1.6664-4(b)(1), (c)(1); *see also Stobie Creek Invs.*, 82 Fed. Cl. at 717. This is a fact-specific determination with many variables, but the question "turns on 'the quality and objectivity of the professional advice obtained.'" *Klamath Strategic Inv. Fund, LLC v. United States*, 472 F. Supp. 2d 885, 904 (E.D. Tex. 2007), *aff'd sub nom. Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537 (5th Cir. 2009) (quoting *Swayze v. United States*, 785 F.2d 715, 719 (9th Cir. 1986)).

At a minimum, the taxpayer must show that the advice was (1) based on all relevant facts and circumstances, meaning the taxpayer must not withhold pertinent information, and (2) not based on unreasonable factual or legal assumptions, including those the taxpayer knows or has reason to know are untrue. Treas. Reg. § 1.6664-4(c)(1); *see also Stobie Creek Invs.*, 82 Fed Cl. at 717-18. Other relevant considerations are the taxpayer's education, sophistication, business experience, and purposes for entering the questioned transaction. Treas. Reg. § 1.6664-4(c).

As a general principle, a taxpayer need not challenge an independent and competent adviser, confirm for

himself that the advice is correct, or seek a second opinion. *Boyle*, 469 U.S. at 251. This is particularly so where the taxpayer is relying on advice of counsel concerning a question of law (as opposed to, for example, meeting a statutory deadline). *See id.* at 250. As the Supreme Court has noted, "Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney . . . would nullify the very purpose of seeking the advice of a presumed expert in the first place." *Id.* at 251.

A taxpayer is not reasonable, however, in relying on an adviser burdened with an inherent conflict of interest about which the taxpayer knew or should have known. *See, e.g., Neonatology Assocs., P.A. v. Comm'r*, 299 F.3d 221, 234 (3d Cir. 2002); *Chamberlain v. Comm'r*, 66 F.3d 729, 732-33 (5th Cir. 1995); *Pasternak v. Comm'r*, 990 F.2d 893, 902 (6th Cir. 1993); *cf. Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP*, 623 F. Supp. 2d 504, 511 (S.D.N.Y. 2009) ("[I]f a law firm had an interest in the sale of a particular tax product, a court could conclude that its opinion would not provide protection from IRS penalties."). What exactly constitutes an "inherent" conflict of interest is somewhat undefined, but when an adviser profits considerably from his participation in the tax shelter, such as where he is compensated through a percentage of the taxes actually sheltered, a taxpayer is much less reasonable in relying on any advice the adviser may provide.

In cases involving Son of BOSS shelters or similar transactions, courts have upheld the imposition of penal-

ties on taxpayers who relied on advisers involved in implementing the strategy, including Jenkens & Gilchrist. *See Stobie Creek*, 82 Fed. Cl. at 715; *see also Maguire Partners-Master Invs., LLC v. United States*, Nos. 06-07371, 06-0774, 06-7376, 06-7377, 06-7380, 2009 WL 279100, at *21 (C.D. Cal. Feb. 4, 2009); *New Phoenix Sunrise Corp. v. Comm'r*, No. 23096-05, 2009 WL 960213, at *22-23 (U.S. Tax Ct. Apr. 9, 2009). Even though "prior to the events leading to its public disgrace and dissolution of the law firm, . . . [Jenkens & Gilchrist] enjoyed a vaunted reputation in legal and tax matters," at least some courts have found that their involvement in structuring the tax shelters constituted an inherent conflict of interest. *See Stobie Creek*, 82 Fed. Cl. at 715. Important to the court's decision in *Stobie Creek* was that the taxpayer's advisers received fees calculated as a percentage of the capital gains sheltered by their strategies. *Id.* (noting that the taxpayer's knowledge that the firms were financially interested in the implementation of the strategy diminished the reasonableness in relying on their advice). Likewise, in *New Phoenix*, the court found that Jenkens & Gilchrist "actively participated in the development, structuring, promotion, sale, and implementation of the [tax shelter] transaction"; the firm had a conflict of interest; the taxpayer expressed multiple concerns about the proper reporting of the transaction; the firm only then issued him an opinion letter; and the taxpayer knew of recent developments in tax law that called the firm's advice into question. 2009 WL 960213, at *22-23.

At the other end of the spectrum, a district court has determined that a taxpayer had reasonable cause for an

underpayment where he relied on advice from attorneys regarding a transaction similar to a Son of BOSS shelter. *Klamath*, 472 F. Supp. 2d at 904-05, *aff'd*, 568 F. 3d 537.[7] In *Klamath*, the plaintiffs engaged in a three-stage investment strategy, partnering with an advisory firm purporting to specialize in foreign currency trading. *Id.* at 889-90. The plaintiffs obtained a large loan to fund the first stage of the strategy and then withdrew, generating large tax losses. *Id.* at 893. The plaintiffs sought advice about their tax basis from two law firms—both of which also represented the partner advisory firm that implemented the investments. *Id.* at 893-94. Although the court determined that the transactions lacked economic substance, it declined to impose penalties based on the plaintiffs' reasonable cause. *Id.* at 904-05. The court rejected the government's argument that the law firms had an inherent conflict of interest simply because they represented the investment firm that implemented the transactions. *Id.* at 905.

### 2. Inherent Conflict of Interest

The government's argument relies heavily on Mayer's purported inherent conflict of interest. The district court held that, at the time of the transaction, Jump had no

---

[7] The Fifth Circuit only affirmed the district court's holding that it possessed jurisdiction to determine the partnership's reasonable cause defense. *Klamath*, 568 F.3d at 548. The government did not challenge the substance of the district court's finding that the taxpayers had reasonable cause. *Id.*

reason to suspect that Mayer's opinion was anything but proper. The government, however, asserts that Jump could not have reasonably relied on that advice because he paid Mayer a large fee to structure the transactions, which ultimately provided a large tax benefit for minimal risk. At oral argument, the government suggested that any time an adviser incorporates a potential tax shelter into a restructuring plan, the taxpayer may not reasonably rely on that adviser's legal advice and must obtain a second opinion. Such a benefit to the adviser, so the argument goes, should render any subsequent advice regarding the transaction's legality unreliable as a matter of law.

We find no such bright-line rule in the case law and decline to implement one here. The government is correct that in many instances, perhaps even most, a taxpayer might be unreasonable in relying on an adviser who stands to gain significantly from a transaction. But one in need of legal advice almost always has to pay something for it. Mayer received a flat fee for his services—which, importantly, included not only an impermissible transaction, but also significant work restructuring Jump's various business entities in response to concerns about his companies' liability. To accept the government's argument would mean that a taxpayer may *never* rely upon the legal advice of the same adviser who counsels the individual on restructuring. The reasonable cause determination depends on the particular facts and circumstances of each case, *see* Treas. Reg. § 1.6664-4(b)(1), and we trust that our district courts can apply the reasonable cause standard accordingly. Thus, Jump's

reliance on Mayer's advice was not *per se* unreasonable simply because he also advised Jump on restructuring his businesses.

### 3. *American Boat's Reasonable Cause Defense*

With that in mind, we turn to the district court's finding that American Boat, through David Jump, had reasonable cause for its tax position. The standard of review plays an integral role in this case. Whether reasonable cause existed—and the findings underlying this determination—are questions of fact, which we review for clear error. *See* Fed. R. Civ. P. 52(a); *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985); *ReMapp Int'l Corp. v. Comfort Keyboard Co.*, 560 F.3d 628, 633 (7th Cir. 2009). The trial court is in a better position to evaluate the evidence, and we will overturn a factual finding only when we are "'left with the definite and firm conviction that a mistake has been committed.'" *Anderson*, 470 U.S. at 573 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). We will not redetermine facts as though hearing the case for the first time, *id.* at 573-74, and "[w]e view the evidence in the light most favorable to the tax court finding." *Square D Co. & Subsidiaries v. Comm'r*, 438 F.3d 739, 743 (7th Cir. 2006).

To the extent that the government appeals the district court's determinations of law, we review them *de novo*. *See id.* "Whether the elements that constitute 'reasonable cause' are *present* in a given situation is a question of fact, but what elements *must* be present to constitute

'reasonable cause' is a question of law." *Boyle*, 469 U.S. at 249 n.8.

Turning to this case, the government goes to great effort to shine the spotlight on Mayer and Jenkens & Gilchrist, remarking on their many years of faulty tax advice and their roles in sheltering money from the public coffers. But the focus of the district court's inquiry was, as it should have been, on American Boat and David Jump. We must consider whether, from Jump's perspective and in light of all the circumstances, the district court clearly erred by finding that Jump had reasonable cause for his underpayment.

Traveling back to 1996, when the Son of BOSS was still in its infancy and before all of the publicity and legal trouble, Erwin Mayer was a reputable attorney at Altheimer & Gray. The district court found that Jump's banker referred him to Mayer in 1996 to establish an estate plan. Mayer advised Jump to restructure his businesses, while at the same time suggesting that he institute a tax-saving transaction. As the court pointed out, Jump did not approach Mayer seeking a tax shelter, nor did he have reason at that time to think that Mayer's advice was faulty. Jump paid Mayer a large, flat fee for his legal services, which included creating a family trust and reorganizing the assets of several large companies. Unlike some of the cases cited above, Mayer was not compensated based on a percentage of the tax benefits he produced. The sole indicator that Mayer's advice might have been unreliable was the divide between the cost of the transactions and the resulting tax benefits.

But, as we stated earlier, the IRS did not pursue Jump based on his 1996 transactions.

Moving forward to 1998, after Jump's towboat nearly doomed the Admiral, the court determined that Jump returned to Mayer for another legitimate reason—advice about reorganizing his businesses to reduce potential liability. Jump was not intending to implement a tax shelter. But Mayer incorporated the second Son of BOSS transaction as part of the overall reorganization. We acknowledge the government's argument that Mayer's tax advice was distinct from any advice he may have provided regarding Jump's tort liability. Mayer was not a tort lawyer, but his overarching counsel was to reorganize, and Jump relied in part on Mayer's recommended means of doing so. Jump again paid a flat fee, albeit a larger one, for this reorganization and advice.

As part of the 1998 transaction, Mayer provided Jump with a lengthy opinion letter stating that the Son of BOSS transactions were legal under then-existing tax law. Despite the government's protestations to the contrary, we find that the letter met the requirements of Treasury Regulation § 1.6664-4(c). The parties do not dispute that Mayer was a competent tax adviser, nor do they disagree that Jump provided Mayer with the pertinent facts. The government claims, however, that the opinion letter contained representations that Jump knew or should have known were false, particularly that the short-sale transactions had a nontax business purpose and that Jump sought an economic profit.

Yet again, the government's position is not meritless. In retrospect, making a profit on the short-sale transactions

was unlikely at best. Jump also stated that the companies transferred the short-sale positions to provide start-up funding for American Boat, which would be operating the towboats. Although this assertion is undermined by the unavailability of the short-sale proceeds during the three days before American Boat fulfilled its corresponding obligation to replace the Treasury Notes, the district court found that Jump was a credible witness and that he did not know the transactions held no profit potential. Specifically, the court concluded that Jump "thought as a part of this that he could make some money." Again, the focus is on what Jump knew or should have known at the time he obtained the opinion letter, and we must defer to the district court's credibility determinations on findings of fact. *See Anderson*, 470 U.S. at 573-74. He paid Mayer a large fee for his work, and the evidence does not compel the conclusion that this fee was strictly for a favorable opinion letter in the event that American Boat were audited. Even though we might have reached a different conclusion, the district court's determination that Jump did not know that certain assertions in the opinion letter were incorrect was not clearly erroneous.

Likewise, we do not find that the court clearly erred by determining that Jump had no reason to know that Mayer had a disqualifying conflict of interest. Of course, Jump knew that Mayer was advising him to undertake these transactions, and Jump paid Mayer a fee. But the fee was for more than simply sheltering Jump's taxes; Mayer performed other legal work by moving significant assets into newly reorganized companies. The court expressly

stated that "he did not pay that fee thinking that as consideration he was getting a tax shelter." To Jump, therefore, the Son of BOSS transactions may have seemed like another component of such work. Had Mayer required his compensation to be a percentage of the sheltered capital gains, perhaps our analysis would be different. Furthermore, the court found that the shelter was never marketed to Jump; rather, he sought only expert legal advice, which was what he thought he was paying for.

After receiving Mayer's opinion letter, Jump enlisted two accounting firms to prepare his personal and business tax documents. The government is correct that Jump never asked Deloitte or Scheffel to opine on the validity of the short-sale transactions. Because of that failure, it is also correct that Jump could not have reasonably "relied on" these accountants to show reasonable cause. But that does not mean the accountants' review of American Boat's and Jump's tax documents is irrelevant. That two reputable accounting firms raised no objection to the tax treatment of Jump's transactions is relevant to the overarching inquiry of whether his reliance on *Mayer's* advice was reasonable. Deloitte not only agreed with Mayer's analysis, but it even informed Jump that it was structuring similar transactions for many of its clients and could have done the same for him. From Jump's perspective, no red flag went up indicating that his transactions—or Mayer's advice regarding them—were improper.

Finally, the government points to the substantial tax benefit that Jump received as a result of the short-sale

transactions, claiming that such a "too good to be true" transaction should have put him on notice that something was awry. There is no doubt that the benefit Jump received was large, and this is the argument that gets the government the nearest to undermining Jump's assertion that he had reasonable cause. But, in general, "it is axiomatic that taxpayers lawfully may arrange their affairs to keep taxes as low as possible." *Neonatology*, 299 F.3d at 232-33 (citing *Gregory v. Helvering*, 293 U.S. 465, 469 (1935)).

Of course, the key term here is "lawfully." The district court determined that, as far as Jump was concerned, Mayer was implementing another transaction in conjunction with reorganizing his business entities, much like the one that Mayer had previously instituted in 1996. The IRS did not inform Jump that the 1996 transaction was abusive by 1998. Furthermore, prior to the 1996 reorganization, Jump held his entities in a domestic international sales corporation (DISC), which was essentially a shell corporation permitting his businesses to defer much of their taxable income obtained from export sales. *See generally Thomas Int'l Ltd. v. United States*, 773 F.2d 300, 301 (Fed. Cir. 1985) (providing a thorough background of the DISC provision of the Internal Revenue Code); *see also Dow Corning Corp. v. United States*, 984 F.2d 416, 417 (Fed. Cir. 1993). Of course, the Son of BOSS transactions, unlike the DISC, were not endorsed by Congress, but Jump had previously—and legally—organized his businesses to reduce his tax liability. Perhaps it was not surprising to him that Mayer suggested another means of obtaining a similar benefit.

This is a close case. In the end, we are searching for clear error in the district court's factual determinations, and we are unable to find it. Whether any judge on this panel might have reached a different conclusion after hearing the evidence first-hand is not the appropriate concern. Contrary to the government's assertion, we are not insulating from penalties every taxpayer who obtains an opinion letter from the same adviser who structures the transaction. And perhaps in today's day and age, after a decade of publicized corporate controversy and scandal, such reliance would not be reasonable. But whether one has reasonable cause for a tax underpayment is a fact-specific inquiry, and we must consider what Jump knew or should have known in 1998. The district court provided detailed reasons for reaching its conclusion, all of which were supported by the evidence before it. We find no clear error in the district court's factual findings, and no error of law in its legal determinations.

### III. CONCLUSION

The district court did not err in finding that American Boat had reasonable cause for its tax position, and, consequently, that it was not subject to the accuracy-related penalty in 26 U.S.C. § 6662. We therefore AFFIRM.