T.C. Memo. 2012-159

UNITED STATES TAX COURT

SAS INVESTMENT PARTNERS, SCHMIDT FINANCIAL GROUP, INC.,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25026-09.                          Filed June 6, 2012.

David B. Shiner and Sanjay Shivpuri, for petitioner.

John W. Stevens, Michael J. Gabor, and Richard J. Hassebrock, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  This case is a partnership-level proceeding subject to the

unified audit and litigation procedures of the Tax Equity and Fiscal

Responsibility Act of 1982, Pub. L. No. 97-248, sec. 402, 96 Stat. at 648.[1]  The sole issue for decision is whether SAS Investment Partners (SAS) has a valid section 6664(c)(1) reasonable cause defense to the penalties respondent determined as a result of a Son-of-BOSS transaction in 2001.[2]

## FINDINGS OF FACT

Sanford Schmidt and Schmidt Financial Group, Inc.

Mr. Schmidt graduated from the University of Illinois with a bachelor of science degree in accounting in 1980.  He has been a certified financial planner since 1988, and he also is a chartered financial consultant and chartered life underwriter.  Mr. Schmidt passed a number of exams to obtain these professional licenses, including tests on estate taxes and estate planning, and he is required to complete continuing education courses to maintain his licenses.[3]

In 1985 Mr. Schmidt started Schmidt Financial Group, Inc. (Schmidt Financial), predominantly to provide estate planning services to individuals with a

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue.

[2]  Petitioner Schmidt Financial Group, Inc., has conceded respondent's numerical adjustments.

[3]  Mr. Schmidt does not remember whether he had to pass an exam on income tax.

net worth in excess of $10 million.[4]  Mr. Schmidt has been the president of Schmidt Financial at all times, and during 2001, the year at issue, he owned 99% of the company.[5]  Mr. Schmidt has made Schmidt Financial a highly successful company, with reported total income of $1,104,120 in 2001 and $1,922,072 in 2002.  Schmidt Financial elected to be treated as an S corporation beginning in 1989, and that election remains in effect.

Schmidt Financial developed its client base primarily by referral.  Often Mr. Schmidt would refer clients to law firms in order to have their legal documents interpreted, and in return those law firms would refer their own clients to Schmidt Financial.

Albert Grasso

Mr. Grasso received his J.D. from Georgetown Law School in 1973 and his LL.M. in taxation from Georgetown Law School in 1974.  He has known Mr. Schmidt for over 20 years.  Since the mid-1990s he has been Mr. Schmidt's

---

[4]  Mr. Schmidt described Schmidt Financial's business as follows:  "We help people analyze their estates, help them determine their goals and objectives, determine how much money they want to pass on to their heirs, how much money they want to leave to charity, and help them with the proper ownership structure of their assets[] * * * [a]s well as the integration of life insurance in that whole process."

[5]  Mr. Schmidt's ex-wife, Karen Schmidt, owned the other 1% of Schmidt Financial.

personal and corporate counsel and the registered agent for all of Mr. Schmidt's

legal entities.

In 1987 Mr. Grasso was one of the original shareholders and founders of

Chuhak & Tecson, a law firm based in Chicago, Illinois. From 1987 until 2006 Mr.

Grasso headed the firm's tax practice and co-chaired the ERISA practice. He

resigned in 2006 but remains of counsel to the firm. Mr. Schmidt's referral network

includes Mr. Grasso and Chuhak & Tecson.

Mr. Grasso first became aware of the transaction now known as the "Son-

of-BOSS" transaction in the mid 1990s.[6] Around that time he read an article about

the transaction and Helmer v. Commissioner, T.C. Memo. 1975-160.[7] Then, in

1997, Mr. Grasso accompanied one of his clients to a meeting with a financial

---

[6] In 106 Ltd. v. Commissioner, 136 T.C. 67, 70 n.2 (2011), we described Son-of-BOSS transactions as follows:

> Son-of-BOSS deals come in different varieties. But they all involve the transfer of assets along with significant liabilities to a partnership, with the goal of increasing basis in that partnership. The liabilities are not completely fixed at the time of transfer, so the partnership ignores them in computing basis. This results in high-basis assets that produce large tax--but not out-of-pocket--losses. * * *

[7] In Helmer v. Commissioner, T.C. Memo. 1975-160, we held that a contingent obligation, such as a short or sold option, is not a liability under sec. 752 because a partnership's obligation under the option does not become fixed until the option is exercised.

advisory firm to discuss the client's possible engagement in a Son-of-BOSS transaction. At some point Mr. Grasso reviewed a draft opinion letter setting out the strategy's legal analysis, and he found that legal analysis to be consistent with his understanding of the tax laws. He also received the documents necessary to implement the transaction. Mr. Grasso's client proceeded with the transaction, which the Internal Revenue Service did not challenge.

Although Mr. Grasso understood the potential tax benefits associated with a Son-of-BOSS transaction, he was not familiar with the economics of the underlying transaction. Mr. Grasso spoke with a number of his clients who had experience trading options, currencies, and commodities, and after those discussions it was his understanding that it would be difficult for casual investors to make money without retaining the services of someone with experience in those areas. Eventually he attempted to engage in his own Son-of-BOSS transaction using the documents he had previously obtained, but he abandoned the effort once he realized that he lacked an understanding of the requisite trading activities.

In 1999 Mr. Grasso served as trustee of the Dennis Ahrens Irrevocable Trust. During that year Mr. Grasso, in his capacity as trustee of the Ahrens Trust, entered into a Son-of-BOSS transaction structured and implemented by the law firm Jenkens & Gilchrist. On or around January 2, 2001, Jenkens & Gilchrist

mailed to Mr. Grasso, at Dennis Ahrens' home address, an opinion letter discussing the Federal tax consequences of the Ahrens Trust's Son-of-BOSS transaction.

Altheimer & Gray

In the 1990s Mr. Schmidt had a "strategic partnership" with Altheimer & Gray.[8] Mr. Schmidt referred his clients to John Buttita, the head of the firm's estate planning practice area, and Mr. Buttita did the same for Mr. Schmidt. Altheimer & Grey also handled Mr. Schmidt's personal legal needs before he retained Mr. Grasso as counsel, drafting Mr. Schmidt's will and setting up his irrevocable life insurance trust.

During the time that Mr. Schmidt maintained a referral relationship with Altheimer & Gray, Erwin Mayer worked as a tax attorney at the firm. Mr. Mayer worked under Mr. Buttita, and Mr. Schmidt believes that Mr. Mayer worked on assignments for approximately three of Mr. Schmidt's clients. In late December 1998 Mr. Mayer left Altheimer & Gray for a position in Jenkens & Gilchrist's Chicago office.

---

[8] Altheimer & Gray dissolved in 2003.

<u>1999 and 2001 Son-of-BOSS Transactions</u>

Mr. Schmidt engaged in two variants of the Son-of-BOSS transaction, once in 1999 and again in 2001. Mr. Schmidt used the 1999 transaction, which the IRS did not challenge, to offset substantial amounts of Schmidt Financial's 1999 and 2000 business income.[9] The 2001 transaction, which is before the Court in this case, would have reduced Schmidt Financial's total income by nearly $2 million over 2001 and 2002.

<u>Mr. Schmidt's 1999 Son-of-BOSS Transaction</u>

In 1999 Mr. Schmidt became aware that a transaction existed that would allow a person to claim significant tax losses without matching economic losses. Mr. Schmidt wanted to learn more, and he set up a meeting with Mr. Mayer, whom he was referred to by Mr. Buttita. At the meeting, which occurred before October 1, 1999, Mr. Mayer explained to Mr. Schmidt how the transaction would be structured and why he considered it to be legal. Mr. Mayer also explained that Mr. Schmidt could make a large profit by hitting the "sweet spot",[10] and he drew on a

---

[9] Son-of-BOSS transactions typically yield capital losses, but Schmidt Financial offset ordinary income by attaching the high basis to foreign currency and taking the position on its returns that the foreign currency transactions produced an ordinary loss. <u>See</u> sec. 988(a); sec. 1.988-3(a), Income Tax Regs.

[10] <u>See</u> <u>infra</u> note 20.

dry erase board diagrams of the various entities and how the transaction would be structured. Mr. Mayer also provided Mr. Schmidt with a redacted opinion letter to review.[11] Mr. Schmidt thought the transaction sounded very complicated, and he left the meeting without an understanding of how it worked.

Following the meeting Mr. Schmidt took the information he had received from Mr. Mayer, including the redacted opinion letter, and gave it to Mr. Grasso. Mr. Grasso reviewed the redacted opinion letter and told Mr. Schmidt that a client of his had engaged in a similar transaction that the IRS had not challenged and legal authority existed that supported the legitimacy of the transaction. Mr. Grasso did not provide Mr. Schmidt with a written opinion letter, but he did charge Mr. Schmidt for the time he spent reviewing the redacted opinion letter. It is not clear whether Mr. Grasso informed Mr. Schmidt that he planned on engaging, or already had engaged, in a Jenkens & Gilchrist Son-of-BOSS transaction on behalf of the Ahrens Trust.

After his discussion with Mr. Grasso, Mr. Schmidt called Mr. Mayer and told him that he would like to implement the transaction. Although Mr. Mayer had told

---

[11] The redacted opinion letter did not contain any facts or information specific to Mr. Schmidt. It did contain a general legal analysis.

Mr. Schmidt that he could earn a profit in addition to creating tax losses, Mr. Schmidt entered into the transaction for the tax savings.

Mr. Schmidt paid Jenkens & Gilchrist a $75,000 fee for structuring and implementing the transaction. Jenkens & Gilchrist determined the amount of its fee on the basis of the tax savings expected to be procured by the transaction, and Mr. Schmidt was aware of this. Mr. Schmidt understood that in return for part of the fee paid to Jenkens & Gilchrist he would receive an opinion letter intended to prevent the imposition of penalties should the IRS not respect the transaction.[12]

---

[12] Jenkens & Gilchrist structured and implemented the 1999 transaction as follows:

- Mr. Schmidt formed Jeska LLC, a single-member limited liability company, and Jeska Investment Partners, a partnership. Mr. Schmidt owned a 99% interest in Jeska Investment Partners, and his ex-wife and two children owned the remaining 1%. Mr. Mayer told Mr. Schmidt that Jeska Investment Partners needed to be liquidated before the end of 1999 to give Mr. Schmidt the intended tax benefits.
- On November 11, 1999, Jeska LLC, through Mr. Schmidt, entered into long and short digital foreign currency option positions on the euro with Deutsche Bank AG New York. The long option called for Jeska LLC to pay a premium of $2 million, and in exchange Deutsche Bank agreed to pay Jeska LLC $4 million if the spot rate on the euro/U.S. dollar exchange rate was less than or equal to $1.0213 per 1.0 euro on December 9, 1999. The short option called for Deutsche Bank to pay a premium of $1.98 million, and in exchange Jeska LLC agreed to pay Deutsche Bank $3.96 million if the spot rate on the euro/U.S. dollar exchange rate was less than or equal to $1.0211 per 1.0 euro on December 9, 1999. Mr. Schmidt had no knowledge of the options' terms

(continued...)

Mr. Schmidt testified that he made a $20,000 profit as a result of the 1999 foreign currency option transaction.[13]  However, he later admitted that his "profit" did not consider the $75,000 fee he paid Jenkens & Gilchrist or the fees he paid for the preparation of his tax returns.

Reporting the 1999 Transaction

Dennis Blevit prepared Mr. Schmidt's tax returns from the early 1980s to 1998.  Mr. Blevit did not understand the 1999 Son-of-BOSS transaction, however,

_____

(...continued)
and did not carefully read the confirmation statement he received from Deutsche Bank.

- On November 12, 1999, Jeska LLC, through Mr. Schmidt, contributed the long and short options to Jeska Investment Partners.
- On December 7, 1999, Jeska Investment Partners purchased Japanese yen.
- On December 9, 1999, the long and short options expired.
- On December 14, 1999, Mr. Schmidt transferred his 99% interest in Jeska Investment Partners to Schmidt Financial.
- On December 15, 1999, Jeska Investment Partners was dissolved and liquidated, and all of the Japanese yen were distributed to Schmidt Financial in liquidation of its partnership interest.  Schmidt financial took a basis in the Japanese yen equal to its claimed basis in Jeska Investment Partners.
- On December 23, 1999, Schmidt Financial sold 40% of the Japanese yen it had received upon liquidation of Jeska Investment Partners.
- In 2000 Schmidt Financial sold the remaining Japanese yen.

[13]  It is not clear whether Mr. Schmidt actually made a $20,000 profit before considering fees paid in relation to the transaction.  Respondent contends that Mr. Schmidt paid a $20,000 net premium and the options expired out-of-the-money.  Thus, according to respondent, Mr. Schmidt could not have earned a profit even without considering any fees paid.

and he informed Mr. Schmidt that he could not prepare his Form 1040, U.S. Individual Income Tax Return, for 1999 or Schmidt Financial's Form 1120S, U.S. Income Tax Return for an S Corporation, for 1999. Mr. Schmidt informed Mr. Mayer of this, and Mr. Mayer referred Mr. Schmidt to Robert Goldstein of American Express and Business Tax Systems. Mr. Mayer told Mr. Schmidt that Mr. Goldstein had prepared tax returns for others who had engaged in the Jenkens & Gilchrist transaction.

Mr. Goldstein prepared the relevant tax returns for Mr. Schmidt. On Schmidt Financial's 1999 Form 1120S Mr. Schmidt reported an ordinary loss of $792,039 from Schmidt Financial's sale of the Japanese yen. As a result Schmidt Financial's 1999 Form 1120S reflected a loss of $10,103 (instead of income of roughly $780,000). In 2000 the remaining Japanese yen were sold and as a result additional business income sheltered.

Jenkens & Gilchrist Pays Mr. Schmidt Referral Fees

In 1999 Gerald Risch, then a client of Mr. Schmidt, sold his business and recognized a significant capital gain. Shortly thereafter Mr. Risch and Mr. Schmidt discussed the possibility of having Mr. Risch engage in a Jenkens & Gilchrist Son-of-BOSS transaction in an attempt to shelter the capital gain he had recognized on the sale of his business. It is not clear who first brought up the

transaction,[14] but at some point Mr. Schmidt recommended Mr. Mayer and Jenkens & Gilchrist. Mr. Schmidt introduced Mr. Risch to Messrs. Goldstein and Mayer, and eventually Mr. Risch decided to implement the transaction.

In a letter dated November 16, 1999, Mr. Schmidt billed Jenkens & Gilchrist for a $216,000 referral fee related to Mr. Risch's transaction. The letter, which had the subject line "Capital Gain Minimization", stated that Mr. Schmidt would receive his referral fee once Jenkens & Gilchrist received its fee from Mr. Risch. From November 16, 1999, to 2001 Mr. Schmidt referred eight other individuals to Mr. Mayer, and Mr. Schmidt received referral fees from Jenkens & Gilchrist for each person he referred.[15] The amounts of Mr. Schmidt's referral fees changed depending on how much Mr. Mayer received. In all Mr. Schmidt received referral fees of $435,000 from Jenkens & Gilchrist. Mr. Schmidt did not tell the clients he referred to Jenkens & Gilchrist that he received referral fees.

---

[14] In the summer leading up to the sale BDO Seidman, the accounting firm used by Mr. Risch's business, described a transaction similar to the Jenkens & Gilchrist transaction in which Mr. Risch could engage. Thus, when Mr. Risch met with Mr. Schmidt in November, Mr. Risch had already learned that a transaction existed that would allow him to attempt to reduce his tax liability without incurring a matching economic loss.

[15] Mr. Schmidt received $16,000 for referring Dennis Ahrens to Jenkens & Gilchrist. It is unclear whether this referral is for the transaction entered into by Mr. Grasso as trustee of the Ahrens Trust.

At some point not clear from the record the IRS challenged Mr. Risch's transaction. In 2004 Mr. Risch learned from his attorney that Mr. Schmidt had profited from Mr. Risch's engaging in the transaction. Mr. Risch's attorney mailed Mr. Schmidt a letter threatening to sue him, and Mr. Schmidt returned the $216,000 that Mr. Schmidt had received from Jenkens & Gilchrist.[16] Mr. Risch also received from Mr. Goldstein all of the fees Mr. Risch had paid Mr. Goldstein to prepare his tax returns. Although the IRS challenged at least some of the transactions engaged in by those individuals Mr. Schmidt referred to Jenkens & Gilchrist, Mr. Schmidt did not return to anyone other than Messrs. Risch and Nash the referral fees he had received.

2001 Son-of-BOSS Transaction

In 2001, after having disposed of the foreign currency acquired in the 1999 transaction and sold in 1999 and 2000 to create the claimed tax losses, Mr. Schmidt decided to engage in another Jenkens & Gilchrist Son-of-BOSS transaction. He called Mr. Mayer, informed him of his decision, inquired as to whether the transaction remained viable, and asked whether it made sense to implement it. Mr. Mayer explained that the IRS had issued Notice 2000-44, 2000-

---

[16] Mr. Schmidt also returned a $45,000 referral fee he had received for referring Dale Nash, Mr. Risch's business partner, to Jenkens & Gilchrist.

2 C.B. 255,[17] and the law had changed, but a similar transaction could be structured that would result in the same benefits. Mr. Schmidt did not read Notice 2000-44, supra, nor did he understand Mr. Mayer's explanation of how the 2001 transaction would differ from the 1999 transaction.

Mr. Mayer, as he had in 1999, gave Mr. Schmidt a redacted opinion letter to review. The redacted opinion letter contained a generic legal analysis that discussed Notice 2000-44, supra, but no facts, representations, or statements specific to Mr. Schmidt's potential transaction. Mr. Schmidt gave the redacted opinion letter to Mr. Grasso and asked him to review it and determine whether the transaction remained viable.[18] Mr. Grasso told Mr. Schmidt that he did not see a problem with the transaction. Mr. Grasso billed Mr. Schmidt for the time he spent reviewing the redacted opinion letter, but he did not give Mr. Schmidt a written opinion letter. Mr. Schmidt decided to proceed.

---

[17] Notice 2000-44, 2000-2 C.B. 255, was issued on August 11, 2000, and published in the Internal Revenue Bulletin on September 5, 2000. Notice 2000-44, 2000-36 I.R.B. 255. The notice warned taxpayers of transactions calling for the simultaneous purchase and sale of offsetting options which were then transferred to a partnership. The notice stated that the purported losses from such offsetting option transactions did not represent bona fide losses reflecting actual economic consequences and that deductions for the purported losses were not allowable for Federal tax purposes.

[18] Although the redacted opinion letter did not contain a law firm's name, Mr. Grasso knew it came from Jenkens & Gilchrist.

Mr. Schmidt's 2001 transaction was very similar to his 1999 transaction. He paid Jenkens & Gilchrist $75,000 to structure and implement the transaction, a fee based on the amount of his expected tax savings, and he used the services of Deutsche Bank to assist with the underlying transaction that ultimately would lead to the claimed tax losses. Instead of entering into long and short options with Deutsche Bank, Jeska LLC entered into long and shorts swaps[19] with the bank. This time Deutsche Bank recommended that Mr. Schmidt use the Japanese yen as the foreign currency involved in the underlying transaction. Deutsche Bank also told Mr. Schmidt that he could hit the "sweet spot" and make millions.[20]

---

[19] Dr. Steven Mann, see infra p. 20, described the long and short swaps as follows:

> [A swap] is a generic term that can describe any number of different transaction structures. In the case of the two digital swap transactions that comprise the JESKA transaction, each swap transaction calls for one party to make a series of payments to the other party. In exchange for the payments, the party making the payments receives two digital put options * * *.

[20] The sweet spot refers to the possibility of making a large profit if the swaps hit just right. Dr. Steven Mann, see infra p. 20, testified that Jeska LLC had theoretical chances of 0.11% and 0.08% of hitting the sweet spots; however, because Deutsche Bank was the calculating agent, i.e., Deutsche Bank determined whether the sweet spot was hit and it would owe Mr. Schmidt millions, the actual probability of the sweet spot payoffs was zero. Taking into consideration the fees paid to structure and implement the transaction, Dr. Mann concluded that Jeska LLC had a 99.8% theoretical probability of a loss and a 100% actual probability of a loss.

As with the 1999 transaction, Mr. Schmidt needed a partnership to which Jeska LLC could contribute the long and short swaps. On November 26, 2001, Jeska LLC and Schmidt Financial formed SAS, a purported partnership,[21] with Jeska LLC the 99% partner and Schmidt Financial the 1% partner. The 2001 partnership agreement, prepared by Jenkens & Gilchrist without input from Mr. Schmidt, was nearly identical to the 1999 partnership agreement, the only difference being the parties' names.[22] Mr. Schmidt did not read the partnership agreement.

On November 27, 2001, Jeska LLC and Deutsche Bank entered into the 2001 "digital swap transaction", with Jeska LLC purchasing long and short swaps.[23]

---

[21] Respondent argues that SAS was not a partnership for tax purposes. We use the terms "partnership", "partner", and related terms for convenience.

[22] For example, both the 1999 and 2001 partnership agreements stated that one of the purposes of the partnerships was to "ensure centralized control of the Partnership assets and other possible investments, including the voting thereof". When questioned by respondent about the 1999 partnership agreement, Mr. Schmidt admitted that he did not tell Mr. Mayer anything about centralized control over partnership assets, nor did he have any idea why centralized control over partnership assets would be important.

[23] Jeska LLC paid Deutsche Bank $2.025 million to enter into the long swap. The terms of the long swap required Jeska LLC to pay Deutsche Bank 260% of $4 million ($10,400,000) on December 11, 2001, and again on December 20, 2001. In

(continued...)

The termination date for both Swaps was December 18, 2011, when they would expire out-of-the-money. As a result Jeska LLC lost $25,000 from the transaction, not including the fees paid to Jenkens & Gilchrist and Mr. Goldstein.[24]

On December 12, 2001, SAS purchased $7,500 worth of foreign currency. On December 20, 2001, Jeska LLC transferred its partnership interest in SAS to Schmidt Financial, thereby causing SAS to liquidate. Schmidt Financial then received the foreign currency in liquidation of its interest in SAS and with a basis

---

[23](...continued)
exchange, Deutsche Bank agreed to pay Jeska LLC 310.625% of $4 million if the Japanese yen/U.S. dollar exchange rate on December 7, 2001, was greater than or equal to 127.00 Japanese yen per 1.0 U.S. dollar, and 310.625% of $4 million if the Japanese yen/U.S. dollar exchange rate on December 18, 2001, was greater than or equal to 128.15 Japanese yen per 1.0 U.S. dollar.

Deutsche Bank paid $1.975 million to enter into the short swap. The terms of the short swap required Deutsche Bank to pay Jeska LLC 260.3125% of $4 million ($10,412,500) on December 11, 2001, and again on December 20, 2001. In exchange, Jeska LLC agreed to pay Deutsche Bank 310% of $4 million if the Japanese yen/U.S. dollar exchange rate on December 7, 2011 was greater than or equal to 127.02 Japanese yen per 1.0 U.S. dollar, and 310% of $4 million if the Japanese yen/U.S. dollar exchange rate on December 18, 2001, was greater than or equal to 128.17 Japanese yen per 1.0 U.S. dollar.

[24] The $25,000 loss is calculated as follows: $1,975,000 (Deutsche Bank's fee to enter into the short swap) + $20,825,000 (amount received as a result of Deutsche Bank's agreeing to pay Jeska LLC 260.3125% of $4 million on December 11, 2001, and again on December 20, 2011) - $2,025,000 (Jeska LLC's fee to enter into the long swap) - $20,800,000 (amount owed to Deutsche Bank as a result of agreeing to pay Deutsche Bank 260% of $4 million on December 11, 2001, and again on December 20, 2011).

equal to its alleged basis in SAS ($2,084,908). On December 21, 2001, Schmidt Financial sold 37% of its foreign currency, and in 2002 Schmidt Financial sold the remaining amounts of foreign currency. Because Schmidt Financial took the foreign currency with an inflated basis that included amounts purportedly representing the values of the swaps, the subsequent sales of the foreign currency created the claimed tax losses that Schmidt Financial reported on its 2001 and 2002 tax returns.

Reporting the 2001 Son-of-BOSS Transaction

Mr. Goldstein prepared the relevant tax returns for Mr. Schmidt. SAS filed a Form 1065, U.S. Return of Partnership Income, for the period beginning November 26, 2001, and ending December 20, 2001. On that Form 1065, accompanying attachments, and Schedules K-1 for Jeska LLC and Schmidt Financial, SAS reported the following transactions: (1) Jeska LLC made capital contributions of $2,109,990; (2) SAS recognized a $25,010 loss on the long and short swaps; (3) SAS purchased foreign currency with a cost and fair market value of $7,500; (4) Jeska LLC transferred its interest in SAS to Schmidt Financial, and as a result treated Schmidt Financial as having a capital account of $2,084,980, i.e., Jeska LLC's initial capital contribution of $2,109,990 minus the $25,010 loss;

(5) Schmidt Financial received, in a liquidating distribution, $7,500 of foreign currency; and (6) "other decrease due to liquidation" of $2,050,000.

On Schmidt Financial's 2001 Form 1120S it reported an ordinary loss of $758,753 from the sale of 37% of the foreign currency it had received from SAS. Schmidt Financial then reduced its $1,104,120 of business income by the $785,753 loss, and the lower amount of total income flowed through to Mr. Schmidt.

On Schmidt Financial's 2002 Form 1120S it reported an ordinary loss of $1,292,631 from the sale of the remaining foreign currency. Schmidt Financial then reduced its $1,922,072 of business income by the $1,292,631 loss, and the lower amount of total income flowed through to Mr. Schmidt.

Mr. Schmidt Receives Opinion Letters for 2001 and 2002

On or around January 9, 2002, and on or around June 4, 2003, Jenkens & Gilchrist provided Mr. Schmidt with opinion letters discussing the Federal tax consequences of the 2001 Son-of-BOSS transaction for Mr. Schmidt's 2001 and 2002 tax years, respectively. Each opinion letter contained a facts section, representations upon which the opinion was based, and a legal analysis. Mr. Schmidt did not read the opinion letters, and he admits that none of the

representations stated in the opinion letters is true.[25]  Mr. Schmidt would not have proceeded with the 2001 transaction without being assured that he would receive opinion letters from Jenkens & Gilchrist.

<u>Expert Witness</u>

At trial respondent called Dr. Steven Mann to testify as an expert witness, and the Court accepted Dr. Mann as an expert in financial economics.  Dr. Mann is an associate professor of finance and Beesley Fellow in finance at the M.J. Neeley School of Business at Texas Christian University, where he has been on the faculty since 1994.  Dr. Mann also has held appointments as a visiting researcher at the U.S. Commodity Futures Trading Commission, and he has been teaching classes focusing on options and derivatives since 1994.

<u>IRS Issues Notice of Final Partnership Administrative Adjustment (FPAA) to SAS</u>

On August 10, 2009, the IRS issued SAS an FPAA for the period November 26 to December 20, 2001, in which it proposed to adjust to zero the following items: (1) capital contributions; (2) Jeska LLC's outside partnership basis; (3) Schmidt

---

[25]  For example, the opinion letter states that "[y]ou entered into the Swaps for substantial nontax business reasons * * *.  You contributed your interests in the Swaps to the Partnership for substantial nontax business reasons * * *.  Your contribution of your interest in the Partnership to [Schmidt Financial] was made for substantial nontax business reasons."

Financial's outside basis; (4) distributions of money and property; (5) other decreases due to liquidation; and (6) other portfolio income (loss). The FPAA also determined that SAS did not exist for Federal tax purposes and asserted penalties.[26] Schmidt Financial, in its capacity as tax matters partner for SAS, filed a timely petition with this Court contesting the determinations made in the FPAA.

Schmidt Financial has conceded the numerical adjustments set forth in the FPAA. See supra note 2. Thus, the only remaining question is whether the partnership has a section 6664(c) reasonable cause/good faith defense--based upon reliance on advice from Mr. Mayer, the Jenkens & Gilchrist opinion letter, advice from Mr. Grasso, and/or advice from Mr. Goldstein--to the accuracy-related penalties the Commissioner asserts under section 6662.

OPINION

I. Venue for Appeal

SAS liquidated and dissolved on December 20, 2001, and Schmidt Financial filed the petition in this case in 2009. Thus, the partnership did not have a

---

[26] Respondent determined that any underpayments of tax due as a result of the adjustments to SAS' partnership items are attributable to a gross valuation misstatement, negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement.

principal place of business at the time the petition was filed, and this case is appealable to the Court of Appeals for the District of Columbia Circuit. See sec. 7482(b)(1) (flush language).[27]

II. Whether SAS and Its Transactions Should Be Disregarded for Tax Purposes

Respondent determined in the FPAA that SAS should be disregarded for tax purposes.[28] The existence of a valid partnership is a partnership item. Petaluma FX

---

[27] Although it is a partner that files a petition for readjustment of partnership items, see sec. 6226, in the case of a petition under sec. 6226 the proper venue for appeal is the Court of Appeals for the circuit in which is located the partnership's principal place of business at the time the petition is filed. Sec. 7482(b)(1)(E). Because SAS had no principal place of business at the time the petition was filed, the proper venue for appeal, absent an agreement in writing, is the Court of Appeals for the District of Columbia Circuit. Sec. 7482(b)(1) and (2).

Schmidt Financial argues that this case is appealable to the Court of Appeals for the Seventh Circuit because there was an agreement in writing. The parties stipulated that "At the time of the filing of the petition in this case, the address of SAS Investment Partners, Schmidt Financial Group, Inc., Tax Matters Partner (hereinafter, 'SAS Investment Partners' or 'Petitioner') was 3860 Green Acre Drive, Northbrook, Illinois 60062". Respondent counters that Schmidt Financial's contention arises from a misreading of the stipulation of facts, i.e., the parties stipulated that Schmidt Financial, not SAS, existed and maintained a place of business at the time the petition was filed. We agree with respondent and add that SAS dissolved in 2001--a fact neither party contests--and therefore could not have had an Illinois address when the petition was filed. In sum, SAS had no principal place of business when the petition was filed, and we do not find that both parties intended to make the Court of Appeals for the Seventh Circuit the venue for appeal. See sec. 7482(b)(2).

[28] Respondent made a number of determinations regarding SAS and its partners under the title of "EXHIBIT A--Explanation of Items". The first

(continued...)

Partners, LLC v. Commissioner, 591 F.3d 649, 652-654 (D.C. Cir. 2010), aff'g in part, rev'g in part and remanding 131 T.C. 84 (2009). Where, as here, the existence of a partnership is challenged, we look to see "whether the partners truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both." Andantech, L.L.C., v. Commissioner, T.C. Memo. 2002-97, aff'd in part, remanded in part, 331 F.3d 972 (D.C. Cir. 2003); see also Luna v. Commissioner, 42 T.C. 1067, 1077 (1964) ("Therefore, while all circumstances are to be considered, the essential question is whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise."). "'Business activity' excludes activity whose sole purpose is tax avoidance." Andantech, L.L.C., v. Commissioner, T.C. Memo. 2002-97; see also ASA Investerings P'ship v. Commissioner, 201 F.3d 505, 512 (D.C. Cir. 2000), aff'g T.C. Memo. 1998-305.

Mr. Schmidt formed SAS solely to enable Schmidt Financial to claim an inflated basis in the foreign currency it received upon liquidation. Although the

---

[28](...continued) determination in the explanation of items is that SAS was not a partnership in fact. The second and third determinations are to the effect that if SAS was otherwise a partnership, it had no business purpose other than tax avoidance, lacked economic substance, constituted an economic sham for Federal income tax purposes, and was abusive under sec. 1.701-2, Income Tax Regs.

partnership agreement for SAS states that SAS was formed to invest the partnership's assets and "ensure centralized control of the Partnership assets and other possible investments", we find this language to be mere window dressing, placed in the partnership agreement in an attempt to provide a legitimate business reason for SAS' formation. Mr. Mayer drafted the partnership agreement without input from Mr. Schmidt as to the partnership's business purposes, and Mr. Schmidt signed where requested without reading the partnership agreement.[29]

The record reveals that SAS was not created for the purpose of carrying on a trade or business but rather as part of a tax shelter that would allow Schmidt Financial to receive partnership property with an inflated basis. Consequently, we will not recognize SAS as a partnership for Federal income tax purposes.

III. Jurisdiction Over Penalties

Having decided that SAS is disregarded for Federal income tax purposes, we have jurisdiction to determine the validity of partnership-level defenses to accuracy-related penalties respondent determined in connection with Schmidt Financial's sales of the foreign currency in 2001 and 2002. See Tigers Eye Trading, LLC v.

---

[29] Had Mr. Schmidt done a cursory review of the partnership agreement he would have noticed that it was nearly identical to the partnership agreement for Jeska Investment Partners, including identical sections titled "Purposes".

Commissioner, 138 T.C. ___, ___ (slip op. at 139-148) (Feb. 13, 2012) (holding that where, as here, the overstatement of a purported partner's basis in property received upon liquidation of a disregarded partnership is attributable to claiming that capital contributions were made to the partnership, the underpayment of tax resulting from the sale of that property is attributable to the reduction to zero of the claimed capital contributions to the partnership, and the Court has jurisdiction to determine the applicability of the gross valuation misstatement penalty to the loss resulting from the sale of the property).

IV.  Section 6662 Penalties and Reasonable Cause Defense

Section 6662(a) and (b)(1), (2), and (3) provides that a taxpayer may be liable for a 20% accuracy-related penalty on the portion of an underpayment of income tax attributable to, among other things, negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement. Section 6662(h)(1) increases the 20% rate to a 40% rate to the extent that the underpayment is attributable to a gross valuation misstatement. An accuracy-related penalty under section 6662 does not apply to any portion of an underpayment of tax for which a taxpayer had reasonable cause and acted in good faith. Sec. 6664(c)(1).

Respondent determined in the FPAA that any underpayments of tax due as a result of the adjustments to SAS' partnership items were subject to penalty under section 6662. Schmidt Financial does not deny that the accuracy-related penalties apply in accordance with their terms. However, it contends that there is a partnership-level defense to the imposition of those penalties at the partner level because the partnership, SAS, meets the reasonable cause exception of section 6664. Pursuant to section 6664(c)(1), an accuracy-related penalty under section 6662(a) may not be imposed with respect to any portion of an underpayment of tax for which SAS, through Mr. Schmidt's actions, had reasonable cause and acted in good faith.[30] Schmidt Financial has the burden of proving reasonable cause. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

A. Reliance on Mr. Mayer or the Jenkens & Gilchrist Opinion

Schmidt Financial first argues that penalties should not be imposed because Mr. Schmidt relied on the advice of Mr. Mayer and the Jenkens & Gilchrist opinion letter. Although a taxpayer's reliance on the advice of a professional may constitute

---

[30] We determine the application of the reasonable cause defense in this partnership-level proceeding because Schmidt Financial claims that the defense applies on the basis of Mr. Schmidt's actions as SAS' de facto managing partner. See Am. Boat Co., LLC v. United States, 583 F.3d 471, 480 (7th Cir. 2009); 106 Ltd. v. Commissioner, 136 T.C. at 75-77; Fears v. Commissioner, 129 T.C. 8, 10 (2007); Rovakat, LLC v. Commissioner, T.C. Memo. 2011-225.

reasonable cause and good faith, see Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also sec. 1.6664-4(c)(1), Income Tax Regs., reliance may be unreasonable when it is placed on advice of a promoter, i.e., an "'adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction'", 106 Ltd. v. Commissioner, 136 T.C. 67, 79 (2011) (quoting Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121).

Schmidt Financial draws our attention to Am. Boat Co., LLC v. United States, 583 F.3d 471 (7th Cir. 2009), a case involving good faith reliance on advice from the same Erwin Mayer discussed above. In Am. Boat Co., LLC the Court of Appeals for the Seventh Circuit affirmed a District Court's determination that American Boat, through its managing partner, reasonably relied on the advice of Mr. Mayer, who had incorporated a Son-of-BOSS transaction into American Boat's legitimate business reorganization. Id. at 484. In upholding the District Court's finding of reasonable cause, the Court of Appeals found relevant that the managing partner had previously used Mr. Mayer's services to establish an estate plan and at that time Mr. Mayer was a reputable attorney at Altheimer & Gray. Id. The Court of Appeals also found no reversible error in the District Court's finding that the managing partner had no

reason to know that Mr. Mayer had a conflict of interest that would have made reliance on his opinion unreasonable. Id. at 485.

Schmidt Financial argues that, like the managing partner in Am. Boat Co., LLC, Mr. Schmidt also used Mr. Mayer's estate planning services before entering into the 2001 Son-of-BOSS transaction and therefore had no reason to question the legitimacy of the 2001 transaction or the Jenkens & Gilchrist opinion letter. We disagree, and we find that any reliance Mr. Schmidt placed on Mr. Mayer's advice or the Jenkens & Gilchrist opinion letter lacked good faith.

To begin, there is no question that Mr. Mayer was a "promoter" of the 2001 Son-of-BOSS transaction. He participated in structuring the transaction, arranged the entire deal, provided a copy of the opinion letter, and profited from selling the transaction to numerous clients. See 106 Ltd. v. Commissioner, 136 T.C. at 80-81. Mr. Mayer also based his fee for the services he provided on a percentage of the tax benefits he produced, something he did not do in calculating his fee for the services he provided American Boat. See Am. Boat Co., LLC, 583 F.3d at 483.

We also find that Mr. Schmidt was aware that Mr. Mayer was promoting the transaction and therefore Mr. Schmidt could not in good faith rely on any advice given, or opinion issued, by Mr. Mayer. Cf. Am. Boat Co., LLC, 583 F.3d 471. Mr. Mayer arranged a similar Son-of-BOSS transaction for Mr. Schmidt two years before

the transaction at issue, and Mr. Schmidt referred eight of his clients to Mr. Mayer so that they could engage in similar transactions. For doing so Mr. Schmidt received a percentage of Mr. Mayer's fee, which Mr. Schmidt knew was based on a percentage of the tax benefits produced.

Because Mr. Mayer promoted the transaction and Mr. Schmidt knew of his conflict of interest, Mr. Schmidt, on behalf of SAS, could not rely on Mr. Mayer's advice or the Jenkens & Gilchrist opinion letter in good faith.

B. Reliance on Mr. Grasso

Schmidt Financial next argues that Mr. Schmidt reasonably relied on Mr. Grasso's advice in entering into the 2001 Son-of-BOSS transaction. A taxpayer's reliance on the advice of a professional may constitute reasonable cause and good faith where the taxpayer proves by a preponderance of the evidence that: (1) the taxpayer reasonably believed that the professional upon whom the reliance was placed was a competent adviser with sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98-99; see also sec. 1.6664-4(c)(1), Income Tax Regs.

We believe that Mr. Schmidt found Mr. Grasso to be a competent adviser with sufficient expertise to justify reliance, and we do not find this belief to be unreasonable. However, we do not find that Mr. Grasso based his oral advice on all necessary and accurate information, nor do we find that Mr. Schmidt actually relied in good faith on Mr. Grasso's judgment.

The advice upon which the taxpayer claims reliance "must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances". Sec. 1.6664-4(c)(1)(i), Income Tax Regs. We do not find this to be the case here. Mr. Grasso advised Mr. Schmidt as to the 2001 transaction after reviewing only a redacted opinion letter that contained no facts or information specific to SAS. Thus, Mr. Grasso based his advice on none of the pertinent facts or circumstances (and certainly not all pertinent facts and circumstances).

Moreover, Mr. Grasso understood the importance of the underlying facts as to whether the transaction would be respected, stating at trial that "you always have to be concerned about the economic circumstances. You have to have a bona fide transaction." However, he advised Mr. Schmidt on the redacted opinion's legal analysis without any knowledge of the facts that would determine whether a bona fide transaction existed.

Mr. Grasso also stated at trial that had he believed the transaction stood no chance of making a profit, he would have advised Mr. Schmidt differently. Mr. Grasso, however, did not base his belief regarding the transaction's profit potential on anything other than in his "experience people routinely made money in option trading". Dr. Mann's expert report concluded that because Deutsche Bank controlled whether the "sweet spot" would be hit, the transaction had no actual chance of earning a profit.

In sum, Mr. Grasso did not base his opinion upon all necessary facts and circumstances.

We also find that Mr. Schmidt did not rely in good faith on Mr. Grasso's judgment. Mr. Schmidt is a highly successful and sophisticated businessman who runs his own business. He holds an accounting degree and is a certified financial planner. Mr. Schmidt may not be a Federal income tax expert, but we find it hard to believe that he did not know that the transaction was improper, especially in light of his "experience, knowledge, and education". See sec. 1.6664-(b)(1), Income Tax Regs.

Moreover, when Mr. Schmidt engaged in the 2001 transaction, he knew exactly what he was "investing" in--a transaction that would allow him to shelter his income without a corresponding economic loss. After Mr. Risch entered into his

transaction in 1999 Mr. Schmidt mailed Mr. Mayer an invoice with the subject line "Capital Gain Minimization".  Additionally, Mr. Schmidt paid Mr. Mayer a fee based on his tax savings, not based on any profit realized as a result of the transaction.

We also find that Mr. Schmidt engaged in the 2001 transaction solely to create tax losses, and his claim that he entered into the 2001 transaction "50/50" to make money and reduce his tax liability is contradicted by the evidence.  First, during the IRS' 2009 investigative interview of Mr. Schmidt, he admitted that he entered into the 2001 transaction primarily to create tax losses.  Second, Mr. Schmidt claimed that he entered into the 2001 transaction because he made a profit in 1999. However, when taking into consideration the $75,000 fee he paid Mr. Mayer, Mr. Schmidt did not make a profit; he lost more than $50,000.  We would think someone with as much business acumen as Mr. Schmidt would consider fees paid in relation to the underlying transaction in determining whether he made a profit.

Accordingly, any reliance Mr. Schmidt claims to have placed on Mr. Grasso's oral advice following his review of the redacted opinion letter that

contained no facts is not reasonable, nor did Mr. Schmidt rely in good faith on Mr. Grasso's advice.[31]

## V. Conclusion

We conclude that SAS, through Mr. Schmidt, does not meet the reasonable cause defense of section 6664(c)(1). In reaching our holding we have considered all arguments made, and to extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing.

Decision will be entered

for respondent.

---

[31] To the extent Schmidt Financial argues that Mr. Schmidt relied on Mr. Goldstein's advice as to the tax treatment of the 2001 transaction, we find, for the reasons stated above, that Mr. Schmidt did not rely in good faith on Mr. Goldstein's advice. Additionally, by 2001 Mr. Schmidt was well aware that Mr. Mayer and Jenkens & Gilchrist were promoters of the Son-of-BOSS transaction, and it was Mr. Mayer who referred Mr. Schmidt to Mr. Goldstein. Thus, any reliance Mr. Schmidt claims to have placed on Mr. Goldstein is not reasonable or supported by the record.